**Electronically Filed
Intermediate Court of Appeals
28704
12-JUL-2011
02:31 PM**

NO. 28704

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


JONATHAN S. DURRETT, as Next Friend of
ALANA K. DURRETT, a minor, Plaintiff-Appellant, v.
ACT, INC., an Iowa Corporation, Defendant-Appellee
and DOES 1-10, Defendant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 07-1-0622)


MEMORANDUM OPINION
(By: Fujise, Presiding J., Leonard and Reifurth, JJ.)

This case involves a dispute between Jonathan S. Durrett, as Next Friend of Alana K. Durrett, a minor ("Appellant"), and ACT, Inc. ("ACT") regarding ACT's stated intention to cancel Ms. Durrett's October 2006 ACT examination scores ("Scores"). ACT proposed to cancel the Scores because Ms. Durrett did not explain to ACT's satisfaction the difference between the Scores and her scores on three earlier ACT tests, or the similarity between her October 2006 test responses and those of another examinee who had the same test form and who was seated near Ms. Durrett during the exam.

Appellant filed a complaint in the Circuit Court of the First Circuit ("Circuit Court"), alleging breach of contract and seeking reformation of the contract along with injunctive and declaratory relief. The Circuit Court[1] issued a temporary restraining order *ex parte*. ACT responded by filing, on April 23, 2007, a motion to stay proceedings pending arbitration of the dispute or to dismiss the complaint for lack of subject matter jurisdiction or improper venue ("Motion to Stay"). On

---

[1]    The Honorable Randall K.O. Lee presided.

July 24, 2007, the Circuit Court[2/] issued its Order Granting Defendant ACT, Inc.'s Motion To Stay Proceedings Pending Arbitration Or To Dismiss For Lack Of Subject Matter Jurisdiction Or Improper Venue, Filed On April 30, 2007 ("Order Granting Stay"). Appellant appeals from the Order Granting Stay. We affirm.

I.   Background

A.   Registration Process

According to ACT, "[t]he ACT examination is a standardized test used by colleges and universities to assist with their admissions decisions." "More than three thousand colleges and universities use ACT examination scores to help them make decisions about admissions, scholarship awards and course placement."

Ms. Durrett took the ACT examination in April, June and August, 2006 before taking the October 2006 examination. To register for the exam online at the time, student applicants were required to enter a social security number, provide credit card information for payment, agree to ACT's rules and procedures, and submit the electronic form.[3/] To successfully register online, a student applicant had to electronically "check" a box certifying that they "read, understand, and hereby agree to abide by all procedures and requirements, including those concerning test score cancellation and binding arbitration." The box appears directly below the following text in section Y of the electronic form:

> **Student:  Read and check below**
>
> By checking the box below, I certify that I am the person whose name appears on this form and that the information is accurate to the best of my knowledge.  I have read, understand, and hereby agree to abide by all procedures and requirements, including those concerning test score cancellation and binding arbitration.  To read ACT's policies regarding test security procedures, test score cancellation and binding arbitration, and remedies in response to ACT errors or testing disruptions/compromises, Click here.

---

[2/]     The Honorable Glenn J. Kim presided.

[3/]     The process described reflects ACT's process for electronic registration for the ACT exam at the time that Ms. Durrett registered online for the October 2006 examination.

2

A student applicant would not be able to complete online registration for the ACT examination without "agree[ing] to the above statement" by electronically checking the box.

ACT's procedures and requirements concerning test score cancellation and binding arbitration appeared in a separate pop-up window that opened when selecting the option to "Click here." The score cancellation instructions stated that:

> ACT reserves the right to cancel test scores when there is reason to believe the scores are invalid. . . . In all instances, the final and exclusive remedy available to examinees who want to appeal or otherwise challenge a decision by ACT to cancel their test scores shall be binding arbitration through written submissions to the Dallas, Texas, office of the American Arbitration Association. The issue for arbitration shall be whether ACT acted reasonably and in good faith in deciding to cancel the scores.

In registering for the exam, Ms. Durrett electronically checked the box in section Y, stating that she read, understood, and agreed to abide by ACT's rules and procedures, including specifically those relating to test score cancellation and binding arbitration. Furthermore, on her answer folder for the October 2006 ACT examination, Ms. Durrett certified in writing that she "agree[d] to the conditions set forth in the ACT registration booklet or website instructions for this exam, including the arbitration and dispute remedy provisions." A student applicant could not complete the ACT examination unless the student applicant signed the certification portion on the front of the test answer folder and agreed to the conditions set out in the ACT registration booklet and website instructions.

B.    ACT Challenges the Scores

Ms. Durrett received a letter from ACT, dated January 29, 2007, questioning the validity of her Scores. ACT noted that Ms. Durrett's Scores were significantly higher than her three previous test scores and an unusual similarity between her October 2006 responses and those of an examinee with the same test form who was seated near to Ms. Durrett during the exam. Ms. Durrett was given three options to address the anomaly: she could retake the exam through private testing that ACT would arrange, cancel her Scores, or provide a statement in her own words that could help establish the validity of the Scores. In

3

the absence of any election, ACT stated that it may then cancel the Scores. Ms. Durrett chose to submit a written statement, dated March 1, 2007, along with supporting statements and a transcript.

On March 26, 2007, ACT responded that Ms. Durrett's statement and documentation were "insufficient to establish the validity of the scores." Ms. Durrett was given the options of retaking the test, cancelling the Scores, or challenging ACT's decision via binding arbitration through written submissions only.

Ms. Durrett chose none of the offered alternatives. Instead, on April 5, 2007, Appellant filed a Complaint seeking to prevent ACT from cancelling the Scores. ACT filed its Motion to Stay, which the Circuit Court subsequently granted. Appellant then filed this appeal.[4]

II. Points of Error

On appeal, Appellant contends that the Circuit Court erred by: (1) finding that there was a valid arbitration agreement between Ms. Durrett and ACT; (2) granting the Motion to Stay because the making of the arbitration agreement between Ms. Durrett and ACT was at issue; (3) failing to find that the arbitration agreement was voidable as a contract of adhesion; and (4) failing to find that the arbitration agreement was voidable under the infancy doctrine.

III. Standard of Review

A. Motion to Stay Pending Arbitration

A petition to stay proceedings pending arbitration is reviewed *de novo* because the existence of a valid and enforceable agreement to arbitrate is a question of law. The trial court's decision is reviewed using the same standard employed by the trial court and based upon the same evidentiary materials as were before it in determination of the motion.

_____

[4] Neither party argues that the appeal is moot. Notwithstanding that, we observe that Ms. Durrett anticipated entering college in 2007 and it is unclear whether ACT still intends to cancel the Scores or, if it does, what practical difference that makes to Ms. Durrett at this point. Nevertheless we proceed, because this case falls within the "capable of repetition yet evading review" exception to the mootness doctrine. *Hamilton ex rel. Lethem v. Lethem*, 119 Hawai'i 1, 5, 193 P.3d 839, 843 (2008).

4

*Ueoka v. Szymanski*, 107 Hawai'i 386, 392, 114 P.3d 892, 898, *reconsideration denied*, 108 Hawai'i 59, 116 P.3d 701 (2005) (citations, internal quotation marks, and brackets omitted).

      B.    Contract Interpretation

> As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court. The determination whether a contract is ambiguous is likewise a question of law that is freely reviewable on appeal. These principles apply equally to appellate review of the construction and legal effect to be given a contractual agreement to arbitrate.

*Brown v. KFC Nat'l Mgmt. Co.*, 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996) (citations and internal quotation marks omitted).

IV.  Discussion

      A.    There Is A Valid Arbitration Agreement Between Ms. Durrett And ACT

      ACT does not seek to compel arbitration in the instant case; consequently, Section 3 of the Federal Arbitration Act ("FAA") ("Section 3") governs the dispute. *See Brown*, 82 Hawai'i at 234, 921 P.2d at 154 ("the FAA applies equally in state or federal courts"). Section 3 provides that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (2011). Assuming that the ACT contract with Ms. Durrett is valid and binding,[5] the FAA governs the obligation of ACT and Ms. Durrett to arbitrate their Score cancellation dispute. *Brown*, 82 Hawai'i at 235, 921 P.2d at 155.

      An order granting a motion to stay is reviewed *de novo*. Thus, we look at the same materials that were before the Circuit Court when it decided the Motion to Stay. *Koolau Radiology, Inc. v. Queen's Medical Ctr.*, 73 Haw. 433, 439-40, 834 P.2d 1294, 1298 (1992). "Generally, in deciding whether to grant a motion to

---

[5]    We address whether the arbitration agreement is itself a binding contract *infra* in sections IV.A.1. and 2.

stay proceedings pending arbitration, courts consider '1) whether an arbitration agreement exists between the parties; and 2) if so, whether the subject matter of the dispute is arbitrable under such agreement.'" *Simbajon v. Gentry*, 81 Hawai'i 193, 196, 914 P.2d 1386, 1389 (App. 1996) (quoting *Koolau Radiology*, 73 Haw. at 445, 834 P.2d at 1300). These are the same questions that a court considers when presented with a motion to compel arbitration. *Koolau Radiology*, 73 Haw. at 445, 834 P.2d at 1300. As a result, we look to those cases for guidance.

> 1. An Arbitration Agreement Exists Between Ms. Durrett And ACT

Hawai'i courts have "long recognized the strong public policy supporting Hawai'i's arbitration statutes as codified in [Hawaii Revised Statutes] Chapter 658. We have stated that 'the proclaimed public policy . . . is to encourage arbitration as a means of settling differences and thereby avoiding litigation.'" *Lee v. Heftel*, 81 Hawai'i 1, 4, 911 P.2d 721, 724 (1996) (original brackets omitted) (quoting *Bateman Constr., Inc. v. Haitsuka Bros.*, 77 Hawai'i 481, 484, 889 P.2d 58, 61 (1995)).

To be valid and enforceable, an arbitration agreement must be: (1) in writing; (2) unambiguous as to the intent to submit disputes or controversies to arbitration; and (3) supported by bilateral consideration. *Brown*, 82 Hawai'i at 239, 921 P.2d at 159.

> a. Existence Of A Writing

The parties do not dispute that the arbitration provision in this case constitutes a writing. The provision was clearly contained in the registration booklet and website instructions.[6] Thus, the first element of a writing is met.

---

[6] Electronic agreements where a customer must affirmatively click a box on a website acknowledging receipt of and assent to the contract term before he or she is allowed to proceed using the website are commonly known as "clickwrap" agreements. "Courts routinely enforce clickwraps." *Major v. McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009); *see, also, Specht v. Netscape Commc'n Corp.*, 306 F3d. 17, 22 n.4 (2d Cir. 2002); *A.V. v. iParadigms*, 544 F.Supp.2d 473, 480 (E.D. Va. 2008); *DeJohn v. The.TV Corp. Int'l*, 245 F.Supp.2d 913, 921 (N.D. Ill. 2003) (clickwrap contract is valid even when the terms of the agreement are not prominently displayed, as long as the party has an opportunity to review the terms by clicking on a link to the text). See also *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir.
(continued...)

b.    Unambiguous Intent To Submit To Arbitration

There must be mutual assent or a meeting of the minds on all essential elements or terms to create a binding contract, which is determined using an objective standard. *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 470-71, 540 P.2d 978, 982 (1975).

Appellant argues that the arbitration terms were not fully disclosed before registration was completed, and thus there was no meeting of the minds. Specifically, Appellant contends that Ms. Durrett never agreed that (1) the arbitration would be by written submissions only; (2) the arbitration would be submitted to the American Arbitration Association ("AAA") in Dallas, Texas; (3) ACT would select the arbitrator;[7] (4) the decision of the arbitrator would be final and binding; (5) she would abide by the arbitration award; (6) ACT would determine the issue to be arbitrated; and (7) the only issue for arbitration would be whether ACT acted reasonably and in good faith in canceling Ms. Durrett's scores.

The record reflects, however, that ACT's online instructions thoroughly described the process for resolving score disputes and made clear that the final and exclusive remedy for challenging a score dispute was binding arbitration. The website instructions stated that, "the final and exclusive remedy available to examinees" who want to challenge ACT's decision to cancel their scores "shall be binding arbitration through written submissions to the Dallas, Texas, office of the [AAA]." The website instructions further specified that the "issue for arbitration shall be whether ACT acted reasonably and in good faith in deciding to cancel the scores."

---

[6] (...continued)
1996). "Even though they are electronic, clickwrap agreements are considered to be writings because they are printable and storable." *Feldman v. Google, Inc.*, 513 F.Supp.2d 229, 236 (E.D. Pa. 2007).

[7]    Appellant appears to misstate this point. The form that ACT sent to Ms. Durrett stated that "AAA will select the arbitrator who will preside in the case." ACT's Director of Test Security stated in an affidavit to the Circuit Court that AAA would select an arbitrator, and that the arbitrator would be from the same state as the student applicant. As such, while ACT selects the arbitration association through which the arbitration will be conducted, ACT does not "select the arbitrator."

When she registered for the exam, Ms. Durrett certified that she "read, understood, and agreed to abide by all procedures and requirements, including those concerning test score cancellation and binding arbitration." In addition to certifying her agreement upon registering for the exam, Ms. Durrett agreed to abide by ACT's rules and procedures when she sat for the October 2006 examination. On her test answer folder, Ms. Durrett signed and certified that she agreed to the conditions "set forth in the ACT registration booklet and website instructions for the exam, including the arbitration and dispute remedy provisions."

As such, Appellant's reliance upon *Douglass v. Plfueger Hawaii, Inc.*, 110 Hawai'i 520, 135 P.3d 129 (2006) as an example of ambiguous intent is misplaced. The Hawai'i Supreme Court held in *Douglass* that the arbitration provision contained in the employee handbook was manifestly unambiguous in its expressed intent that "any and all claims arising out of the employee's employment with the Company and his/her termination shall be settled by final and binding arbitration[,]" but found no mutual assent when the employee merely signed an acknowledgment form verifying receipt of the handbook. 110 Hawai'i at 532, 135 P.3d at 141. Unlike the instant case, the record in *Douglass* did not indicate that the employee was "informed of the existence of the arbitration provision, let alone that he would be bound by it." 110 Hawai'i at 533, 135 P.3d at 142. *See also Swift Securities, Ltd. v. Yau*, No. 28759, 2009 WL 383679 (Haw. February 13, 2009) (no unambiguous intent to arbitrate when the word "arbitration" does not appear anywhere in the agreement).

This case is markedly different; not only because the agreement is entered into electronically, but because ACT took steps not taken by the enforcing party in the cases above to ensure that contracting parties understood that they were signing an agreement to arbitrate. Most importantly, the link to the arbitration provision was located directly above the box where Ms. Durrett indicated her assent to those same terms, the provision unambiguously stated that arbitration would be "the final and exclusive remedy" available to Ms. Durrett if she chose to challenge a score cancellation decision, "binding arbitration"

was explicitly referred to (twice) in the acknowledgment form, and Ms. Durrett was asked to, and did, provide her explicit assent to abide by the arbitration provision by electronically checking the box.[8]  *See Vickery v. Hastert*, No. 28586, 2009 WL 383682 (Haw. February 13, 2009) (no ambiguity in a physical contract where arbitration provision was followed by an instruction to "[p]lease check whether you agree to this arbitration provision", and the plaintiff checked "Yes. Agree.")

Appellant argues further, citing *Specht v. Netscape Commc'n Corp.*, 306 F.3d 17 (2d Cir. 2002), contending that the arbitration terms were not "clear and conspicuous" because viewing them required accessing a separate web page, and was not required to complete the registration process.[9]  The notable feature in *Specht* was that users confronted with the "Download" button, located at or near the bottom of their screen, did not encounter any reference to further information about the plug-in program or the existence of license terms governing its use unless they happened to scroll down to the next screen.  306 F.3d at 23.  In this case, however, the link to the arbitration provision was located directly *above* the box where Ms. Durrett indicated her assent to those same terms, and the introductory text referred explicitly to "test score cancellation and binding arbitration."  As such, Ms. Durrett was conspicuously confronted with the fact that she was agreeing to binding arbitration and provided with the opportunity to view those terms immediately *before* she indicated her agreement by electronically checking the box.

---

[8]      In addition, Ms. Durrett executed a hand-written certification on the front of her October 2006 ACT test answer folder on which it also states: "I agree to the conditions set forth in the ACT registration booklet or website instructions for this exam, including the arbitration and dispute remedy provisions."  Beneath that, Ms. Durrett hand-wrote: "I agree to the statement above and certify that I am the person whose name and address appears on this form."  Ms. Durrett then signed and dated the certification.

[9]      Nothing requires that student applicants actually read the terms and conditions under the methodology preferred by the Appellant.  We are not persuaded that requiring that student applicants scroll through to the bottom of the text before encountering a box or a button affirming that the student applicant has read the material and agrees to be bound by it, or makes it any more likely that the material will be read, or make the terms any more "clear and conspicuous" than the practice already adopted here by ACT.

Ms. Durrett electronically signed the agreement, asserting thereby that she had read, understood and agreed to its terms, but stated in a declaration thereafter that she had not, in fact, read or understood ACT's procedures and requirements. "[T]he general rule of contract law is that one who assents to a contract is bound by it and *cannot complain that he has not read it or did not know what it contained.*" *Douglass*, 110 Hawaiʻi at 534 n.12, 135 P.3d at 143 n.12 (*quoting Leong v. Kaiser Found. Hosp.* 71 Haw. 240, 245-46, 788 P.2d 164, 168 (1990) (internal quotation marks omitted). Consequently, we conclude that Ms. Durrett and ACT unambiguously indicated their intent to submit score cancellation disputes or controversies to arbitration.

    c.    The Arbitration Agreement Is Supported By Bilateral Consideration

"Consideration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment." *Douglass*, 110 Hawaiʻi at 534, 135 P.3d at 143 (*citing Shanghai Inv. Co. v. Alteka Co.*, 92 Hawaiʻi 482, 496, 993 P.2d 516, 530 (2000) *overruled on other grounds by Blair v. Ing*, 96 Hawaiʻi 327, 31 P.3d 184 (2001)).

Appellant argues that ACT's arbitration clause was not supported by bilateral consideration because "only the registrant is required to forego their right to a judicial forum and accept the binding arbitration process." Appellant correctly notes that the registration booklet and website instructions do not make it "manifestly unambiguous" that both the registrant and ACT are bound by arbitration. *See Brown*, 82 Hawaiʻi at 239-40, 921 P.2d at 159-60 (upholding an arbitration provision because it was manifestly unambiguous that both parties were bound by the arbitration agreement).

We have previously held that an arbitration provision included as part of a larger contract does not require its own consideration to be binding:

> *Douglass* and *Brown* are inapplicable to this case with respect to this issue because they concerned arbitration agreements that were not part of a larger contract, whereas the arbitration provision in this case was part of the Agreement. In *Douglass* and *Brown*, the Hawaiʻi Supreme Court was tasked with determining whether the respective arbitration agreements, standing alone, could constitute

10

> contracts. Here, we need not make such a determination because neither party disputes that the Agreement involved a mutual exchange of consideration. As Damon Key states in its answering brief, "[t]he consideration given by Damon Key for the contract was its agreement to provide legal services to Jason. This consideration by Damon Key is sufficient to make the arbitration clause of the contract enforceable even if Damon Key's requirement to arbitrate is not co-extensive with that of Jason." The Vickerys cite to no case law, and we find none, for the proposition that an arbitration provision must involve its own separate, mutual exchange of consideration.

*Vickery v. Hastert*, No. 28586, 2009 WL 383682 *7 (Haw. App. February 13, 2009) (footnote omitted). As we did in *Vickery*, we conclude that there was sufficient bilateral consideration in the registration contract to support upholding the arbitration provision.

2. The Subject Matter Of The Dispute Is Arbitrable

Although the public policy underlying Hawai'i law strongly favors arbitration over litigation, the mere existence of an arbitration agreement does not mean the parties must submit to arbitration if the dispute is outside the scope of the arbitration agreement. *Brown*, 82 Hawai'i at 244, 921 P.2d at 164. The scope of the arbitration agreement depends on the wording of the contract. *Rainbow Chevrolet, Inc. v. Asahi Jyuken (USA), Inc.*, 78 Hawai'i 107, 113, 890 P.2d 694, 700 (App. 1995), superseded by statute as stated in, *Ueoka v. Szymanski*, 107 Hawai'i 386, 114 P.3d 892 (2005).

In this case, there is no ambiguity regarding the subject matter of the dispute. Appellant challenges ACT's decision to cancel Ms. Durrett's Scores. This dispute falls within the language of the contract and arbitration agreement. Consequently, there is a valid arbitration agreement between Ms. Durrett and ACT.

B. The Proposed Cancellation Of Ms. Durrett's Scores Was Referable To Arbitration Under The Arbitration Agreement Without First Holding A Trial

Section 3 states that if any suit or proceeding is brought to court that deals with an issue referable to arbitration "under an agreement in writing for such arbitration," the court where the suit is pending, "upon being satisfied that the issue involved in such suit or proceeding is referable to

11

arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

Appellant refers to Section 4 of the FAA ("Section 4") and the United States Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mf. Co.*, 388 U.S. 395 (1967) and argues that the Circuit Court erred in granting the Motion to Stay because the making of the arbitration agreement was in issue, and a trial, therefore, should have been had on that issue.  Under Section 4, if the making of the arbitration agreement is in issue, the Circuit Court must proceed to trial on that issue.

Section 4, however, is not implicated by ACT's Motion to Stay.  This is not a proceeding to compel arbitration under Section 4, but a motion to stay the proceedings under Section 3.  *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F.Supp. 688, 692 (S.D.N.Y. 1966) ("When a defendant asks for a stay under § 3, he is not seeking specific performance (i.e., an order requiring that the parties proceed to arbitration), but merely a stay of a kind long familiar in common law and in equity actions.")

Neither Section 3 nor *Prima Paint* requires a trial at all.  *Kelly v. UHC Mgmt. Co.*, 967 F.Supp. 1240, 1254 (N.D. Ala. 1997) ("The plain language of § 3 states that the court is to stay the action 'upon being satisfied' that the issue involved is referable to arbitration. . . . No mention whatsoever is made of a right to a jury trial under § 3.").  Here, the issue was a dispute over ACT's decision to cancel Ms. Durrett's Scores.  This was precisely the issue to be decided by arbitration under the arbitration agreement.  Therefore, the Circuit Court properly stayed the proceedings pending arbitration once it was satisfied that the issue involved was referable under the arbitration agreement.

As such, being satisfied that the proposed cancellation of Ms. Durrett's Scores was referable to arbitration under the arbitration agreement, the Circuit Court was, therefore, not required to hold a trial before granting the Motion to Stay.

C.   The Arbitration Agreement Is Not An Unenforceable
     Contract Of Adhesion

Contracts of adhesion are unenforceable if two
conditions are present: "(1) the contract is the result of
coercive bargaining between parties of unequal bargaining
strength; *and* (2) the contract unfairly limits the obligations
and liabilities of, or otherwise unfairly advantages, the
stronger party." *Brown*, 82 Hawai'i at 247, 921 P.2d at 167.
"Arbitration agreements are not usually regarded as unenforceable
contracts of adhesion because the second condition is generally
lacking . . ., the agreement 'bears equally' on the contracting
parties and does not limit the obligations or liabilities of any
of them[.]" *Id.* (quoting *Leong*, 71 Haw. at 247-48, 788 P.2d at
168). Arbitration agreements merely substitute one forum for
another. *Id.*

That is the case here, too. ACT did not unfairly limit
its own obligations and liabilities or give itself unfair
advantages in the arbitration agreement. ACT did not, for
example, reserve the right to change the terms of the agreement
at its sole discretion.[10/] ACT, like Ms. Durrett, will be bound
by the arbitrator's decision if the examinee wishes to challenge
ACT's decision to cancel exam scores. ACT, like Ms. Durrett, can
only provide written submissions to the arbitrator for
determination of whether it acted reasonably. Finally, there is
no discernible advantage to ACT associated with providing written
submissions to the Dallas, Texas office of the AAA. *Contra,*
*Domingo v. Ameriquest Mortgage Co.*, 70 F.App'x. 919 (9th Cir.
2003) (finding a forum selection clause unenforceable when
employees are in a worse position than the stronger party to
afford costs of travel). With written submissions, neither party
has to travel to Dallas, Texas.

---

[10/]   Appellant erroneously equates ACT's reservation of rights to amend
the terms and conditions of access to and use of the company's internet site
with the defendant's reservation of rights to amend the terms in the employee
handbook in *Douglass*, and contends that this "allows ACT to unilaterally
change the terms [of the arbitration provision]." This is not consistent with
the effect of ACT's reservation of rights, which do not permit ACT to change
the terms of the arbitration provision at all.

Here, although ACT had superior bargaining strength, neither its obligations nor its liabilities were limited by the arbitration agreement. Therefore, the arbitration agreement in this case is not an unenforceable adhesion contract.

>    D.   The Circuit Court Did Not Err In Failing To Address Whether The Arbitration Agreement Was Voidable

> > Hawaiʻi has long recognized the common law rule - referred to as "the infancy doctrine" or "the infancy law doctrine" - that contracts entered into by minors are voidable. Under this doctrine, a minor may, upon reaching the age of majority, choose either to ratify or avoid contractual obligations entered into during his or her minority. *See* 4 Richard A. Lord, *Williston on Contracts* § 8:14 (4th ed. 1992); *see also* Restatement (Second) of Contracts, §§ 7, 12, and 14 (1979).

*Douglass*, 110 Hawaiʻi at 525, 135 P.3d at 134 (some citations omitted); *see Zen v. Koon Chan*, 27 Haw. 369, 371 (Haw. Terr. 1923) ("A minor's act and that of an alleged insane person are voidable only but they become void upon disaffirmance by the minor on coming of age and by the insane person upon attaining sanity.").

Appellant does not argue that Ms. Durrett has voided all or part of her arbitration agreement with ACT. Similarly, Ms. Durrett contested only entering into the arbitration agreement, declaring below that she "was not aware that by registering I was agreeing to arbitration and was giving up the right to file a lawsuit", "did not understand or agree to arbitration", "never agreed to submit any disputes over the [Scores] to arbitration in Dallas, Texas on written submissions only", and "did not sign an agreement to arbitrate disputes concerning my [Scores]". Ms. Durrett does not contend that she was disavowing or had disavowed it.

Under the infancy doctrine, the contract is "voidable," not "void." As Ms. Durrett did not argue or present any evidence that she voided any agreement under the infancy doctrine, the Circuit Court did not err when it failed to rule on the subject of Ms. Durrett's infancy or its effects on the case.

V.    Conclusion

        For the reasons expressed above, we affirm the Circuit Court's July 24, 2007 Order Granting Stay.

        DATED:  Honolulu, Hawaiʻi,  July 12, 2011.


Adrian W. Rosehill
(Alan J. Ma with him on the
briefs)
(Stubenberg & Durrett)
for Plaintiff-Appellant.

Melvi Miyagi
(John T. Komeiji and Karen Y.
Arikawa with him on the brief)
(Watanabe Ing, LLP)
for Defendant-Appellee.

Presiding Judge

Associate Judge

Associate Judge